## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## NEWNAN DIVISION

| | | |
|---|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR SOUTHERN COMMUNITY BANK, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| JAMES S. CAMERON, GEORGE R. DAVIS, SR., ROBERT B. DIXON, JR., RICHARD J. DUMAS, WILLIAM W. LESLIE, JACKIE L. MASK, GARY D. MCGAHA, THOMAS D. REESE, and WILLIAM M. STRAIN, | ) ) ) ) ) ) ) | **CIVIL ACTION NO.:** _____ |
| | ) | |
| Defendants. | ) | **JURY TRIAL DEMANDED** |
| _____ | ) | |

## COMPLAINT

Plaintiff, the Federal Deposit Insurance Corporation ("FDIC") as Receiver for Southern Community Bank ("FDIC-R"), for its Complaint, states as follows:

### I.  INTRODUCTION

1.     The FDIC brings this case in its capacity as Receiver for Southern Community Bank ("Bank") of Fayetteville, Georgia, pursuant to authority granted by 12 U.S.C. § 1821.

2.     In this action, the FDIC-R seeks to recover damages currently estimated at $10.3 million from former Bank officer and director Gary D. McGaha

("McGaha"), and former Bank directors James S. Cameron ("Cameron"), George R. Davis, Sr. ("Davis"), Robert B. Dixon, Jr. ("Dixon"), Richard J. Dumas ("Dumas"), William W. Leslie ("Leslie"), Jackie L. Mask ("Mask"), Thomas D. Reese ("Reese"), and William M. Strain ("Strain") (collectively, "Defendants"). The FDIC-R reserves the right to amend this Complaint to allege and claim additional damages.

3.      Defendants were negligent and grossly negligent by, among other things, approving certain loans ("Subject Loans") that violated the Bank's internal policies, regulations and/or prudent banking practices, all of which resulted in damages.  Defendants are liable for the damages caused by their negligence and gross negligence.

4.      In this lawsuit, the FDIC-R does not seek to collect upon outstanding loans, but rather seeks to collect damages flowing from Defendants' negligence and gross negligence, which include, among other things, lost operating capital, lost profits, and lost investment opportunities.

## II.  THE PARTIES

**Plaintiff**

5.      Plaintiff, the FDIC-R, was appointed as Receiver for the Bank on June 19, 2009, by the Georgia Department of Banking and Finance ("GDBF").

2

Pursuant to 12 U.S.C. § 1821(d)(2)(A)(i), the FDIC-R succeeded to all of the rights, titles, and privileges of the failed Bank and its depositors, account holders, other creditors, and stockholders.

**Defendants**

6.     Defendant McGaha served as the Bank's President and Chief Executive Officer ("CEO") from August 1999 until July 2008, and was a director and member of the Director's Loan Committee ("DLC") from June 2000 until July 1, 2008.  On information and belief, McGaha is a resident citizen of Suches, Georgia.

7.     Defendant Cameron served as a director of the Bank from August 1999 until the Bank failed.  Cameron also served on the DLC from June 2000 through December 2005.  Beginning in 2006, he served on the DLC for the first six months of each year until the Bank failed.  On information and belief, Cameron is a resident citizen of Pensacola, Florida.

8.     Defendant Davis served as a director of the Bank from August 1999 until the Bank failed.  Davis began to serve on the DLC at least as early as January 2004 and, starting in 2006, he served on the DLC for the first six months of each year until the Bank failed.  On information and belief, Davis is a resident citizen of Fayetteville, Georgia.

9.     Defendant Dixon served as a director of the Bank from August 1999 until the Bank failed.  Dixon also served on the DLC from June 2000 until the Bank failed.  On information and belief, Dixon is a resident citizen of Newnan, Georgia.

10.     Defendant Dumas served as a director of the Bank from November 1999 until the Bank failed.  Dumas also served as Chairman of the Board of Directors ("Board") from April 2008 until the Bank failed.  He served on the DLC from at least as early as 2005 through 2008.  On information and belief, Dumas is a resident citizen of Fayetteville, Georgia.

11.     Defendant Leslie served as a director of the Bank from August 1999 until the Bank failed.  He served on the DLC for the last six months of each year from at least as early as 2005 through 2008.  On information and belief, Leslie is a resident citizen of Senoia, Georgia.

12.     Defendant Mask served as a director of the Bank from August 1999 until the Bank failed.  He served on the DLC from June 2000 through July 2005 and, thereafter, served on the DLC for the last six months of each year through 2008.  On information and belief, Mask is a resident citizen of Fayetteville, Georgia.

13.     Defendant Reese served as Chairman of the Board from August 1999

until April 2008.  He also served on the DLC from June 2000 until in or about June 2008.  On information and belief, Reese is a resident citizen of Senoia, Georgia.

14.     Defendant Strain served as a director of the Bank from November 1999 until the Bank failed.  He served on the DLC for the first six months of each year from at least as early as 2005 through 2009.  On information and belief, Strain is a resident citizen of Fayetteville, Georgia.

15.     Among other things, as members of the Bank's DLC, all of the Defendants – Cameron, Davis, Dixon, Dumas, Leslie, Mask, McGaha, Reese and Strain – were responsible for analyzing underwriting memoranda and supporting documentation to ensure that loans complied with the Bank's lending policies, regulations and prudent banking practices.

## III.  JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction for this action pursuant to 12 U.S.C. § 1811, *et seq*., 12 U.S.C. § 1819(b)(1) and (2), and 28 U.S.C. § 1331 and 1345.  The FDIC is a corporation organized and existing under the laws of the United States of America.  Actions to which the FDIC is a party are deemed to arise under the laws of the United States.  The FDIC, including in its capacity as Receiver, has the authority to sue and complain in any court of law.  12 U.S.C. § 1819.

17.     This Court has personal jurisdiction over Defendants, who at all relevant times conducted business in the state of Georgia.

18.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because all or substantially all of the acts charged herein occurred in this district and the claims arose in this district.

## IV.  FACTUAL BACKGROUND

### A.   <u>Defendants Pursued a Strategy of Rapid Growth Through Funding High-Risk Loans.</u>

19.     The Bank was founded in August 1999 and began operations in June 2000 as a state-chartered nonmember bank headquartered in Fayetteville, Georgia.

20.     From the Bank's inception, Defendants instituted an aggressive growth strategy centered on high concentrations in commercial real estate ("CRE") lending, with an emphasis on acquisition, development, and construction ("ADC") loans.

21.     CRE loans are loans in which a bank takes a security interest in real property used for commercial purposes as an additional source of repayment for a loan related to that property.

22.     CRE loans are often risky, particularly CRE loans made to developers, builders and speculators whose incomes are subject to fluctuations in real estate values.  Fluctuations in real estate values occur in cycles and are foreseeable risks

for banks that issue CRE loans.

23.    ADC loans are a type of CRE loan in which the loan proceeds are used to acquire commercial real property and/or to finance construction of a commercial project, such as single family residences, apartments, condominiums, or commercial office buildings.

24.    ADC loans are more risky than other types of CRE loans due to, among other things, the lack of a cash flow source prior to the successful completion of construction and sale or lease of the property, uncertainties of this development and sale process, and the frequent reliance on secondary sources of repayment.  Prudent ADC lending requires careful underwriting, timely evaluation of, and response to, economic trends impacting the industry, and strict adherence to applicable loan policies, regulations and prudent lending practices.

25.    From 2001 through 2008, the Bank's portfolio of high-risk ADC loans dramatically increased as a percentage of the Bank's total capital and as a percentage of its average gross loans, both of which exceeded average percentages for the Bank's peer group:

| | ADC Loans as a Percentage of Total Capital | | ADC Loans as a Percentage of Average Gross Loans | |
|---|---|---|---|---|
| Year Ended | Southern Community | Peer Group Average | Southern Community | Peer Group Average |
| 2001 | 217% | 51% | 32.23% | 7.09% |
| 2002 | 225% | 56% | 30.85% | 7.72% |
| 2003 | 243% | 67% | 29.60% | 8.67% |
| 2004 | 266% | 81% | 28.94% | 10.44% |
| 2005 | 457% | 104% | 37.73% | 12.72% |
| 2006 | 480% | 117% | 54.81% | 14.96% |
| 2007 | 484% | 124% | 57.26% | 16.31% |
| 2008 | 563% | 111% | 51.68% | 15.26% |

**B.** **The Bank's Loan Policy and Other Applicable Rules and Regulations Established Standards Defendants Were Required to Follow in Approving the Loans.**

**1.** **The Bank's Loan Policy Established Lending Standards Defendants Failed to Follow.**

26.     The loan policy ("Loan Policy") relevant to the FDIC-R's claims was created in 2000 and was last revised by the Bank's Board of Directors on July 17, 2007. The pertinent provisions remained the same throughout the time period relevant to the FDIC-R's claims, unless otherwise noted herein.

27.     Defendants were fully aware of the Loan Policy's requirements at least as early as May 2000. Minutes of the May 2, 2000 Board meeting report

stated: "[Former Bank Chief Lending Officer Fred] Faulkner conducted a

comprehensive review of the Loan Policy for the board of directors reviewing each

chapter in detail.  Numerous questions were asked with Mr. Faulkner providing

answers and clarification.  Mr. Faulkner gave special emphasis to Reg O issues…

Loan Review and Compliance functions, Portfolio Mix, Documentation and Credit

Quality."

28.    Pursuant to the Loan Policy, the President (Defendant McGaha) and

the Board (which included all other Defendants) had joint responsibility for

administration of and adherence to the Bank's established lending policies.

Defendants failed to follow the Loan Policy with respect to the Subject Loans, as

described more fully in Section IV.C. below.

29.    The Loan Policy established several "basic guidelines" for lending,

including: "1. We want to eliminate… high risk loans….  3. Sound credit analysis

will precede all commercial and real estate loan decisions….  [and] 4. We take

loan documentation very seriously.  If we do not have time to document a loan

correctly, there is insufficient time to make the loan."  Loan Policy, General Loan

Policy Section II.A., at page 1.

30.    The Loan Policy also provided that "Prohibited Loans" included

"[l]oans to our executive officers or directors when they are not consistent with

Reg O or our loan policy."  Loan Policy, General Loan Policy Section II.B.3.f., at page 3.  The Loan Policy further stated:  "Any loan to an executive officer, principal stockholder, or director (or related interest) that causes the aggregate amount owed by that individual to exceed $500,000, or the higher of (1) 5.0% of the bank's capital or (2) $25,000, must receive prior approval of a majority of the board of directors.  Loans to executive officers are limited to $100,000 for purposes other than an education or a home, and certain other exceptions outlined in Regulation O."  Loan Policy, General Loan Policy Section V.H., at page 8.

31.     The Loan Policy provided that "[a]nalyzing a potential loan requires careful consideration of (1) the borrower; (2) the borrower's financial condition as reflected on acceptable financial statements; (3) the borrower's management capability; (4) the borrower's industry; and (5) the economic environment in which the loan would be granted."  Loan Policy, General Loan Policy Section V.A., at page 4.

32.     The Loan Policy further provided that "[p]rudent lending requires the individual granting the loan: (1) Determine that the borrower intends to repay and is a creditworthy individual; (2) Determine that the borrower is a capable manager; (3) Understand the specific purpose of the loan; (4) Understand the source and plan of repayment; (5) Evaluate all back-up sources of repayment; and (6) Determine

that the purpose, plan, and source of repayment, as well as collateral, are acceptable, reasonable, practical, and accomplishable within the normal framework in which the borrower operates.  Adverse features of each loan should be documented."  Loan Policy, General Loan Policy Section V.A., at page 4.  The Loan Policy also required that any policy exceptions be cited on the credit memoranda submitted for approval.  Loan Policy, General Loan Policy Section X., at page 11.

33.    The Loan Policy stated: "[C]ollateral is not a substitute for the borrower's ability to repay.  Collateral is taken as a way to ensure repayment or to provide an additional source of repayment.  Cash flow is our primary source of repayment; collateral is our secondary source of repayment.  The quality and liquidity of collateral are of paramount importance and must be confirmed before the loan is made."  Loan Policy, General Loan Policy Section V.B., at page 5.

34.    The Loan Policy also provided that "it is bank policy to analyze cash flows before making a loan and then structure the loan so that it will repay on a schedule acceptable to the bank from normal cash flows."  Loan Policy, General Loan Policy Section V.E., at page 7.

35.    The Loan Policy required that "[b]efore closing a loan, our credit file must include adequate financial statements, or tax returns on (1) the borrower, (2)

11

all guarantors, (3) endorsers, and (4) co-makers.  Business and personal financial statements are not considered adequate until they have been signed and contain, at a minimum, a balance sheet and income information from the most recent fiscal year…. We must also have on file all applicable credit reports." Loan Policy, General Loan Policy Section IX.A., at page 10.  The Loan Policy separately stated that financial statements were required for all commercial loans.  Loan Policy, Loan Administration, Authorities, and Approval Procedures Section I., at page 31.

36.     The Loan Policy defined "interim real estate loans," which include ADC loans, as any loan secured by real estate wherein the proceeds are used for acquiring and improving the subject real estate.  Loan Policy, Types of Loans Section 4.I., at page 46.  The Loan Policy further provided that "[i]n no event will the maturity of an interim real estate loan extend for two years." Loan Policy, Types of Loans Section 4.III., at page 47.  For interim real estate loans, the Loan Policy also required that all collateral "must be supported by a qualified appraisal by a professional appraiser acceptable to the bank," and that any exceptions must be requested and approved in memorandum form.  Loan Policy, Types of Loans Section 4.VI., at page 47.

37.     Pursuant to the Loan Policy, loan approval authorities were based on the total credit amount outstanding to the borrower at the time of approval.  The

DLC was responsible for approving all loans above the legal lending limits of individual Bank personnel or the loan officer's Loan Committee, up to the legal lending limit of the Bank.  The Board was required to review on a monthly basis all loans granted for relationships greater than $1 million.  The DLC approved all of the Subject Loans.

38.     From 2000 through July 17, 2007, the Loan Policy adopted by reference the following supervisory loan-to-value ("LTV") ratio limits set for real estate lending by Appendix A to Part 365 of the FDIC's Rules and Regulations, 12 C.F.R. § 365, *et seq*.:

| Loan Category | Loan-to-value limits |
|---|---|
| Raw land | 65% |
| Land development | 75% |
| Construction: | |
|    Commercial, multifamily, and other non residential | 80% |
|    1- to 4-family residential | 85% |
| Improved property | 85% |

Loan Policy, Appraisal Policies Section XV., at page 98.

39.     The Loan Policy, as revised July 17, 2007, lowered the Bank's internal LTV ratio limits for land development, 1- to 4-family residential construction and improved property as follows:

| Loan Category | Loan-to-value limits |
|---|---|
| Raw land | 65% |
| Land development | 70% Retail / 85% Discount |
| Construction: | |
| Commercial, multifamily, and other non residential | 80% |
| 1- to 4-family residential | 80% |
| Improved property | 75% |

Revised Loan Policy, Appraisal Policies Section XV., at page 104.

By lowering these allowed LTV ratios, the Bank effectively tightened its lending standards by requiring more collateral.

40.     Defendants failed to adhere to the Loan Policy in approving the Subject Loans, including the provisions noted above.

2.      **Regulation O Specified Underwriting Criteria Defendants Failed to Follow.**

41.     Regulation O, promulgated by the Board of Governors of the Federal Reserve System, 12 C.F.R. § 215, *et seq.* ("Regulation O"), and made applicable to the Bank by Section 18(j) of the Federal Deposit Insurance Act, 12 U.S.C. § 1828(j), provides that the chairman of the board is considered an "executive officer" of a bank unless excluded, by resolution of the board of directors or by the bylaws of the bank, from participation (other than in the capacity of a director) in major policymaking functions of the bank, and the chairman of the board does not actually participate therein.  12 C.F.R. § 215.2(e)(1).

42.     As a voting member of the Executive and Director Loan Committees of the Bank, Defendant Reese, the former Chairman of the Board, participated in major policymaking functions at the Bank and, thus, was an executive officer of the Bank under Regulation O.

43.     As an executive officer, Defendant Reese was subject to additional restrictions contained in Section 215.5 of Regulation O, which limited the extensions of credit that the Bank could make to him (or to entities owned or controlled by him) for purposes other than his children's education or his residence to no more than a total of $100,000.

44.     Defendants failed to adhere to these requirements, despite knowing of

them at least as early as May 2000.

**3.    FDIC Rules and Regulations Establish Appraisal Standards and Criteria That Defendants Failed to Follow.**

45.    Section 323 of the FDIC's Rules and Regulations, 12 C.F.R. § 323, *et seq.*, which was applicable to the Bank, requires that real estate appraisals used in connection with the Subject Loans be performed in writing, in accordance with uniform standards, by appraisers whose competency has been demonstrated and whose professional conduct will be subject to effective supervision.

46.    Section 323.3(a) provides, in pertinent part, that "[a]n appraisal performed by a state-certified or licensed appraiser is required for all real estate-related financial transactions except those in which: (1) The transaction value is $250,000 or less; … (5) The transaction is a business loan that: (i) Has a transaction value of $1 million or less; and (ii) Is not dependent on the sale of, or rental income derived from, real estate as the primary source of repayment; … [or] (7) The transaction involves an existing extension of credit at the lending institution, provided that: (i) There has been no obvious and material change in market conditions or physical aspects of the property that threaten the adequacy of the institution's real estate collateral protection after the transaction, even with the advancement of new monies; or (ii) There is no advancement of new monies, other than funds necessary to cover reasonable attorney's fees."

16

47.    Section 323.3(b) requires an appropriate evaluation of real estate that is consistent with safe and sound banking practices even if an appraisal is not required.

48.    Defendants failed to adhere to these rules and regulations, despite knowing of these requirements.

## C.    Defendants Were Negligent and Grossly Negligent in Approving the Subject Loans in Violation of the Bank's Loan Policy, Applicable Rules and Regulations, and Prudent Banking Practices.

49.    Defendants were negligent and grossly negligent in approving the Subject Loans in violation of the Bank's Loan Policy, regulations and/or prudent banking practices.  Attached to this Complaint as Exhibit A is a chart that identifies the borrower,[1] loan amount, approval date and Defendants who voted to approve each of the Subject Loans.

### 1.    Reese Loans

50.    As discussed in paragraphs 41-44 above, Reese was an executive officer of the Bank under Regulation O.  Thus, Reese was subject to additional

---

[1]  Borrower A referenced herein represents an individual borrower whose name has been withheld to protect his privacy.  LLC A referenced herein was named after an individual member of the LLC.  The name of the LLC has been withheld to protect the privacy of the individual member.  Guarantors A, B, C, and D referenced herein represent individual guarantors on the Subject Loans whose names have been withheld to protect their privacy.  The names of Borrower A, LLC A and Guarantors A, B, C, and D will be provided once an appropriate protective order is in place.

restrictions contained therein which limited the extensions of credit that the Bank could make to him (or to entities owned or controlled by him) for purposes other than his children's education or his residence to no more than a total of $100,000.

51.     On or around July 23, 2004, Defendants Dixon, Dumas, Leslie, McGaha and Strain approved a $500,000 loan to Reese for the purpose of acquiring commercial property.  The collateral for this loan was a first deed to secure debt on 20.73 acres of property located in Fayette County, Georgia.

52.     The July 23, 2004 Regulation O Checklist, prepared as part of those Defendants' approval of this loan, confirmed that the Bank's total direct exposure to Reese at that time exceeded $1.3 million, a violation of Regulation O and the Loan Policy.  This additional $500,000 loan to Reese, which exceeded the $100,000 loan limit set forth in Regulation O and increased the Bank's total direct exposure to Reese above $1.8 million, reflected an additional violation of Regulation O and the Loan Policy by the Defendants who approved this loan.

53.     For the reasons discussed above, including in paragraphs 51-52, Defendants Dixon, Dumas, Leslie, McGaha and Strain were negligent and grossly negligent in violating Regulation O and the Loan Policy in connection with this July 23, 2004 loan to Reese and have caused damages related thereto estimated at $500,000.

54.     On or around January 4, 2005, Defendants Cameron, Davis, Dixon, Mask, McGaha and Strain approved a $400,000 loan to Reese for the purpose of replenishing working capital that Reese had used to purchase 221 acres of property located in Meriwether County, Georgia.  The collateral for this loan was a first deed to secure debt on that property in Meriwether County.  The primary source of repayment for the loan was the cash flow of Reese.  No secondary source of repayment was listed.

55.     The January 4, 2005 Regulation O Checklist confirmed that the Bank's total direct exposure to Reese at that time exceeded $1.9 million, a violation of Regulation O and the Loan Policy.  This additional $400,000 loan to Reese, which exceeded the $100,000 loan limit set forth in Regulation O and increased the Bank's total direct exposure to Reese above $2.3 million, reflected an additional violation of Regulation O and the Loan Policy by those Defendants who approved this loan.

56.     Less than three months later, on or around March 22, 2005, Defendants Cameron, Davis, Dixon, Dumas, McGaha and Strain approved a $300,000 increase in the January 4, 2005 loan to Reese, to a total of $700,000 for that loan, for the purpose of providing Reese with additional working capital.  The collateral for this increase was a first deed to secure debt on the same 221 acres of

property in Meriwether County and on a half-acre lot.  The primary source of repayment for this loan increase was the cash flow of Reese, and the secondary source of repayment was sale of collateral.

57.     The March 22, 2005 Regulation O Checklist confirmed that the Bank's total direct exposure to Reese at that time exceeded $2.5 million, a violation of Regulation O and the Loan Policy.  This additional $300,000 loan increase to Reese, which exceeded the $100,000 loan limit set forth in Regulation O and increased the Bank's total direct exposure to Reese above $2.8 million, reflected an additional violation of Regulation O and the Loan Policy by those Defendants who approved this loan.

58.     For the reasons discussed above, including in paragraphs 54-57, Defendants Cameron, Davis, Dixon, Dumas, Mask, McGaha and Strain were negligent and grossly negligent in violating Regulation O and the Loan Policy in connection with the January 4, 2005 loan to Reese and the March 22, 2005 increase of that loan, and have caused damages related thereto estimated at $415,000.

59.     On or around April 19, 2005, Defendants Cameron, Davis, Dixon, Dumas, McGaha and Strain approved a $250,000 loan to Reese Family Properties, Inc. ("RFP") for the purpose of building a boat dock and common facilities at a

residential development in Hayesville, North Carolina.  RFP was a family-owned
company primarily engaged in the development of residential property.  Reese was
an owner and the Chief Executive Officer of RFP, and he personally guaranteed
this loan.  The primary source of repayment was the sale of residential lots in the
subdivision, and the secondary source of repayment was borrower cash flow.  The
collateral for this loan was a second deed to secure debt on seven lots in the
Hayesville development.

60.     The March 22, 2005 Regulation O Checklist and the April 5, 2005
credit memorandum presented to the Defendants who approved this loan
confirmed that the Bank's total direct exposure to Reese at that time exceeded
$2.75 million, a violation of Regulation O and the Loan Policy.  This additional
$250,000 loan to RFP, which exceeded the $100,000 loan limit set forth in
Regulation O and increased the Bank's total direct exposure to Reese above $3
million, reflected an additional violation of Regulation O and the Loan Policy by
the Defendants who approved this loan.

61.     The April 5, 2005 credit memorandum, along with the other
information already known to these Defendants or provided to them by the loan
officer, revealed additional deficiencies and violations of the Loan Policy,
regulations and prudent banking practices that showed this loan should not have

been approved.

62.    With respect to the primary source of repayment for the loan, sale of
collateral, the credit memorandum did not provide any information regarding the
quality or liquidity of the collateral.  The credit memorandum indicated "$50,000
per lot," but did not list any appraised values or comparable lots sales to
substantiate that price.  The credit memorandum also did not include any
information regarding the real estate market in the Hayesville area, even though
that market was outside of the Bank's primary lending territory.  The April 7, 2005
DLC meeting minutes further showed that the Defendants who approved this loan
recognized the high-risk nature of the loan by initially agreeing that the proposed
funding would be participated with Nexity Bank, only to subsequently approve the
loan without any such participation.

63.    With respect to the secondary source of repayment, borrower cash
flow, the credit memorandum indicated there were signs of financial strain.  The
"key risks" listed in the credit memorandum were "Borrower is in industry that is
heavily interest rate dependent for success" and "Borrower debt load is high as
with most developers."  Despite the identified risk regarding the borrower's
financial condition, the section of the credit memorandum for analysis of RFP's
financial condition was left blank.  The financial information submitted with

respect to Reese also failed to demonstrate that he had the financial strength to service or pay off another loan.  The cash flow and debt service analysis of Reese also did not support the loan because that analysis relied on stale income information from 2003 and showed that Reese's income had declined significantly from 2002.

64.    On or around November 15, 2005, Defendants Dixon, Dumas, Leslie and McGaha approved a $301,000 increase of the April 19, 2005 loan to RFP, from its then-current balance of $149,000 to $450,000, for the purpose of increasing and converting the loan to a line of credit.  The primary source of repayment for this increase was the sale of collateral, and the secondary source of repayment was borrower cash flow.  The collateral was first deeds to secure debt on five lots in the same Hayesville residential development and on an additional lot in a development in Crested Butte, Colorado.

65.    The November 15, 2005 credit memorandum presented to the Defendants who approved this increase did not list the Bank's total direct exposure to Reese at that time, even though the credit memorandum noted that Reese remained an owner of RFP "and provide[d] guidance for the company in terms of finding deals."  Those Defendants were aware the Bank's total direct exposure to Reese exceeded $2.75 million at that time, a violation of Regulation O and the

Loan Policy.  This additional $301,000 converted line of credit increase to RFP, which exceeded the $100,000 loan limit set forth in Regulation O and increased the Bank's total direct exposure to Reese, reflected an additional violation of Regulation O and the Loan Policy by the Defendants who approved this loan.  The credit memorandum and DLC meeting minutes also show that this increase was approved by less than a majority of the Board, in violation of the Loan Policy.

66.     The credit memorandum presented to the Defendants who approved this increase to RFP, along with the other information already known to these Defendants or provided to them by the loan officer, revealed additional deficiencies and violations of the Loan Policy, regulations and prudent banking practices that showed this increase should not have been approved.

67.     With respect to the primary source of repayment for the increase, sale of collateral, the credit memorandum did not provide any information regarding the quality or liquidity of the collateral.  The credit memorandum did not list any appraised values or comparable lots sales to substantiate the generic reference to "LTV = 75%".  The credit memorandum also did not include any information regarding the real estate market in the Hayesville area or in the area where the Colorado lot was located, even though those markets were outside of the Bank's primary lending territory.

68.     With respect to the secondary source of repayment, borrower cash flow, the credit memorandum did not indicate that RFP had the ability to repay the converted line of credit.  The "key risks" listed in the credit memorandum again were "Borrower is in industry that is heavily interest rate dependent for success" and "Borrower debt load is high as with most developers."  No RFP tax returns or externally prepared financial statements were provided.  The only financial information listed for RFP was "internal" 2005 year-to-date data.  The credit memorandum stated that RFP had negative net working capital and "[t]he company does a very limited amount of business and cash flow is expected to be inconsistent from year to year."

69.     No updated financial information regarding Reese was provided.  The credit memorandum indicated that five other owners of RFP would personally guarantee the converted line of credit, but the memorandum only provided limited financial information with respect to one of RFP's other owners, Guarantor A.  The financial information submitted with respect to Guarantor A also failed to demonstrate that he had the financial strength to service this converted line of credit.  While Guarantor A was represented to have total assets of $1.2 million, nearly $1.1 million of those "assets" consisted of self-valued real estate interests and "other".  The credit memorandum stated that Guarantor A had only $20,000 in

cash and $270,000 in liabilities.  No cash flow or debt service analysis of Guarantor A was performed, and that section of the credit memorandum was left blank.

70.     For the reasons discussed above, including in paragraphs 59-63, Defendants Cameron, Davis, Dixon, Dumas, McGaha and Strain were negligent and grossly negligent in connection with the April 19, 2005 loan to RFP.  For the reasons discussed above, including in paragraphs 64-69, Defendants Dixon, Dumas, Leslie and McGaha were negligent and grossly negligent in connection with the November 15, 2005 converted increase to that loan.  The Defendants who approved this loan and converted increase have collectively caused damages estimated at more than $175,000.

71.     On or around June 29, 2006, Defendants Davis, Dixon, Dumas, Mask and McGaha approved a $200,000 loan to Reese for the purpose of providing working capital.  The collateral for this loan was a second deed to secure debt on property which was already serving as collateral on earlier Reese loans: the 20.73 acres of property located in Fayette County and the 221 acres of property located in Meriwether County.

72.     The June 29, 2006 Regulation O Checklist confirmed that the Bank's total direct exposure to Reese at that time exceeded $3.6 million, a violation of

Regulation O and the Loan Policy.  This additional $200,000 loan to Reese, which

exceeded the $100,000 loan limit set forth in Regulation O and increased the

Bank's total direct exposure to Reese above $3.8 million, reflected an additional

violation of Regulation O and the Loan Policy by those Defendants who approved

this loan.

73.    For the reasons discussed above, including in paragraphs 71-72,

Defendants Davis, Dixon, Dumas, Mask and McGaha were negligent and grossly

negligent in violating Regulation O and the Loan Policy in connection with this

June 29, 2006 loan to Reese and have caused damages related thereto estimated at

$200,000.

74.    On or around May 25, 2007, Defendants Davis, Dixon, Dumas,

McGaha and Strain approved a $350,000 loan to Reese Developers, Inc. ("Reese

Developers") for the purpose of providing working capital.  Reese Developers was

primarily engaged in the development of residential property in the Atlanta area,

with concentrations in Coweta and Henry counties.  Reese Developers was 100%

owned and operated by Reese, and this loan was personally guaranteed by Reese.

The primary source of repayment for the loan was cash flow of the borrower, and

the secondary source of repayment was sale of collateral.  The collateral for this

loan was a first deed to secure debt on the same 221 acres in Meriwether County,

which property was cross-collateralized with the separate loans to Reese discussed in paragraphs 54, 56 and 71 above.

75.     The May 25, 2007 Regulation O Checklist confirmed that the Bank's total direct exposure to Reese at that time exceeded $3.25 million, a violation of Regulation O and the Loan Policy.  This additional $350,000 loan to Reese Developers, which exceeded the $100,000 loan limit set forth in Regulation O and increased the Bank's total direct exposure to Reese above $3.6 million, reflected an additional violation of Regulation O and the Loan Policy by those Defendants who approved this loan.

76.     The credit memorandum presented to the Defendants who approved this loan to Reese Developers, along with the other information already known to those Defendants or provided to them by the loan officer, revealed additional deficiencies and violations of the Loan Policy, regulations and prudent banking practices that showed this loan should not have been approved.

77.     With respect to the primary source of repayment for the loan, cash flow from the borrower, the credit memorandum indicated that Reese Developers was experiencing financial stress.  The "key risks" listed  in the credit memorandum for this loan were "Borrower is in industry that is heavily interest rate dependent for success" and "Borrower debt load is high as with most

developers." While Reese Developers was represented to have unidentified total assets of $22.9 million, it also reported liabilities in excess of $22.1 million. The credit memorandum did not include any cash flow or debt service analysis of Reese Developers. The financial information submitted with respect to Reese also failed to demonstrate that he had the financial strength to service or pay off another loan. The cash flow and debt service analysis of Reese also did not support the loan because that analysis relied on stale income information from 2005.

78.     With respect to the secondary source of repayment for the loan, sale of collateral, the credit memorandum did not provide any information regarding the quality and liquidity of the collateral. No appraised value was listed, and the Defendants who approved this loan did not require as a condition for approval that the collateral be appraised prior to closing to confirm the loan would comply with the Loan Policy's LTV ratio limits. As a result, the Bank's records indicate this loan was closed without an appraisal of the collateral.

79.     For the reasons discussed above, including in paragraphs 74-78, Defendants Davis, Dixon, Dumas, McGaha and Strain were negligent and grossly negligent in connection with this May 25, 2007 loan to Reese Developers and have caused damages related thereto estimated at $350,000.

2. **Borrower A Loans**

80.     On or around April 7, 2005, Defendants Cameron, Dumas and McGaha approved a $2.5 million construction guidance line of credit to Borrower A.  Borrower A was a new Bank customer.  The stated purpose of this line of credit ("Borrower A LOC") was to fund construction of 12 spec homes in a residential subdivision.  The DLC initially capped the number of spec homes at 6 after Defendant Cameron expressed concern over having such "a large number of specs in this particular subdivision."  The DLC, however, did not impose a corresponding cap on the amount of the Borrower A LOC, choosing instead to approve the full $2.5 million requested, which led to over $2.1 million being drawn against the line during the next 12 months.  Repayment terms were interest-only for 12 months with principal due at maturity.  The primary source of repayment was the sale of the spec homes.  The secondary source of repayment was "asset conversion" of Borrower A.

81.     The credit memorandum presented to the Defendants who approved the Borrower A LOC, along with the other information provided to them by the loan officer during the DLC meeting, revealed many deficiencies and violations of the Bank's Loan Policy and prudent banking practices that showed the Borrower A LOC should not have been approved.

82.     The "key risk" listed in the credit memorandum was "general economic conditions."  Despite the fact that the primary source of repayment for the Borrower A LOC was the sale of spec homes to be built, the credit memorandum did not provide any information or analysis regarding the proposed construction budget to build those homes, how the homes would be marketed, how the sales price of the homes would be set, or other factors affecting the feasibility of the project.

83.     The credit memorandum and other information provided to the Defendants who approved the Borrower A LOC also failed to demonstrate that Borrower A had the financial strength to service or pay off the LOC.  The credit memorandum also did not include any cash flow or debt service analysis of Borrower A.  Instead, that section of the credit memorandum was left blank.

84.     On or around May 30, 2006, Defendants Cameron, Davis, Dixon, McGaha, Reese and Strain approved the renewal of the Borrower A LOC and a $1.5 million increase to that LOC, to $4 million.  At the time of this request, the balance due on the Borrower A LOC was $2,189,740.  The credit memorandum and other information presented to the Defendants who approved this increase revealed repeat deficiencies and violations of the Bank's Loan Policy and prudent banking practices that showed this increase should not be approved.

85.    A "key risk" listed in the credit memorandum for this increase was "[i]f permanent mortgage rates continue to climb."  The credit memorandum did not identify why this increase was needed or provide any information regarding the status of the construction of the spec homes funded by the original LOC.  A three paragraph "credit addendum" attached to the credit memorandum vaguely referenced a separate request "for 6 homes on lots" owned by a business partner of Borrower A and that "we are asking to bump up this current line $1,500,000 in case of the request being done by [Borrower A]," but no underwriting information related to the construction of 6 additional spec homes was provided in the credit memorandum approved by those Defendants.

86.    The primary and secondary sources of repayment listed in the credit memorandum for this increase remained the "sale of homes" and "asset conversion," respectively.  Despite the lack of any underwriting information to justify unspecified "sale of homes" as being an adequate source of repayment for the Borrower A LOC increase, those Defendants approved the increase anyway. The credit memorandum for this increase also failed to demonstrate that Borrower A had the financial strength to service or pay off this increase.  The credit memorandum also did not include any cash flow or debt service analysis of Borrower A.

87.     On or around August 8, 2006, just over two months after increasing the Borrower A LOC to $4 million, Defendants Dixon, Dumas, Leslie, Mask, McGaha and Reese approved an additional $1,776,446 increase in the Borrower A LOC, up to the Bank's legal lending limit of $5,776,446.  The credit memorandum presented to those Defendants who approved this second increase was identical in all material respects to the credit memorandum presented for the May 2006 increase.  The credit memorandum for the second increase did not identify why an additional substantial increase was needed only two months later or provide any updated information regarding the construction of spec homes funded by the Borrower A LOC.  The approval of this second increase violated the Bank's Loan Policy and prudent banking practices for these reasons and for the reasons set forth in paragraphs 80-86 above, which discussed approval of the first increase based on identical deficient information.

88.     For the reasons discussed above, including in paragraphs 80-87, Defendants Cameron, Davis, Dixon, Dumas, Leslie, Mask, McGaha, Reese and Strain were negligent and grossly negligent in connection with the Borrower A LOC and have collectively caused damages related thereto estimated at no less than $1 million.

89.     After approving the Borrower A LOC and related increases,

Defendants became aware of additional adverse information related to Borrower A's construction project and his overall financial condition.  A May 8, 2007 credit memorandum and the DLC meeting minutes of the same date related to the renewal of the Borrower A LOC reflected that Defendants Cameron, Davis, Dixon, McGaha, Reese and Strain were concerned the Bank's primary source of repayment for the Borrower A LOC was "18 specs in one subdivision and only one [home] under contract" and a "key risk" was "spec inventory getting some age to it."  The May 8, 2007 credit memorandum and corresponding DLC meeting minutes also indicated that Borrower A's total direct debt at the Bank had grown to $6,706,875 and he now had nearly $39 million in total liabilities related to his real estate interests.  The September 27, 2007 DLC meeting minutes further indicated that Defendants Cameron, McGaha, Leslie and Reese knew the spec homes securing the Borrower A LOC "[were] not very good collateral."  On or around October 16, 2007, Defendants Dixon, Dumas, Leslie, McGaha and Reese renewed all construction loans under the Borrower A LOC for six months with interest only due at maturity, despite the fact that, as reflected in the credit memorandum of that date, such renewal would result in the following three exceptions to the Loan Policy: "The conversion of 1 construction loan to a lot… would put us @ about 102% LTV (policy exception).  6 construction loans in the deferred interest of 6

months have been on the books for 2 years (policy exception).… Doing 6 months of interest due @ maturity is [an] exception to our policy."

90.     Despite their knowledge of these deficiencies, on or around January 22, 2008, Defendants Cameron, Davis, Dixon, Dumas, McGaha, Reese and Strain approved an additional $485,000 loan increase to Borrower A.  The stated purpose of this request was to increase a separate prior loan to Borrower A "from $140,000 to $625,000."  While that separate loan was not part of the Borrower A LOC facility, the Defendants who approved this increase knew that, based on the information provided by the loan officer to them and contained in the January 22, 2008 credit memorandum, these additional loan proceeds would be used fund interest payments on the Borrower A LOC.

91.     The January 22, 2008 credit memorandum revealed additional deficiencies and violations of the Loan Policy and prudent banking practices which showed this increase should not have been approved.  The primary and secondary sources of repayment were listed as "cash flow of borrower."  However, the financial data section of the credit memorandum was left entirely blank, and no cash flow or debt service analysis of Borrower A was performed.  While the credit memorandum indicated that collateral for this increase was a first deed to secure debt on 2.51 acres of land with commercial zoning, no appraised value for that

collateral was listed.  Instead, the credit memorandum simply stated "LTV=85%,"
which even if accurate would have represented a LTV ratio in excess of the limit
set forth in the Loan Policy.  The January 22, 2008 DLC meeting minutes which
reflected approval of this increase request noted at the same time that "this is a
substandard asset and should be downgraded to substandard (7)."

92.    For the reasons discussed above, including in paragraphs 89-91,
Defendants Cameron, Davis, Dixon, Dumas, McGaha, Reese and Strain were
negligent and grossly negligent in connection with this additional loan to Borrower
A and have caused damaged related thereto estimated at no less than $485,000.

### 3.    United International Mortgage Corporation Loans

93.    On or around April 4, 2006, Defendants Cameron, Davis, McGaha
and Reese approved a $5 million guidance line of credit to United International
Mortgage Corporation ("UIMC").  The purpose of that line of credit ("UIMC
LOC") was for UIMC to fund mortgages for rehabilitation properties to other
borrowers.  The primary source of repayment for the UIMC LOC was to be loan
payments received from UIMC's customers, and the secondary source of
repayment was the guarantee of UIMC's principal, Guarantor B.  The UIMC LOC
was secured by UIMC's assignment of the deed to secure debt and note from each
UIMC customer to the Bank.

94.     Just one week earlier, at the March 28, 2006 DLC meeting,

Defendants Cameron, Davis, Dixon, Strain and Reese tabled consideration of the

proposed LOC "for further review and for [loan officer Lou Gehrig Martin] to visit

United's office."  At that meeting, "operation risk" associated with the proposed

LOC was discussed, including that UIMC (and not the Bank) would inspect the

rehabilitation properties and advance funds based on those inspections.

95.     The credit memorandum presented to the Defendants who approved

the UIMC LOC, along with the financial statements and tax returns of UIMC and

Guarantor B attached thereto, revealed many deficiencies and violations of the

Bank's Loan Policy and prudent banking practices that showed the UIMC LOC

should not have been approved.

96.     UIMC was only three years old, and the financial information

provided for UIMC was "company prepared" and not independently verified.  In

response to the question, "Is overall profitability stable or increasing over the last 3

years reviewed," the credit memorandum indicated a prior lack of profitability,

stating: "[f]or two years the loss has come down."  The credit memorandum also

stated that UIMC already had a $15 million line of credit at another bank, which

UIMC was looking to simultaneously increase to $20 million.  Despite the lack of

verifiable information and signs of business strain, the Directors who approved the

UIMC LOC agreed that loan payments from UIMC's unidentified customers would provide the primary source of repayment for the UIMC LOC.

97.     The credit memorandum listed the secondary source of repayment as the personal guarantee of UIMC's principal, Guarantor B, but the Defendants who approved the UIMC LOC knew Guarantor B's guarantee was of dubious strength. Guarantor B's personal financial statement listed total assets of $6.1 million and a net worth of $4.3 million, but $3.6 million of those assets were unverified real estate and $1.6 million of those assets were listed as unidentified "other".  While the credit memorandum stated Guarantor B had no contingent liabilities, the memorandum also indicated that Guarantor B had personally guaranteed UIMC's existing $15 million line of credit at another bank.

98.     At the same time the UIMC LOC was considered by the DLC, Guarantor B agreed to personally guarantee an additional $5 million loan at the Bank to another entity owned by Guarantor B, Hi-Roc Builders, LLC ("Hi-Roc"). In the April 11, 2006 DLC meeting minutes discussing the separate approval of the Hi-Roc loan, it was noted that Guarantor B was a guarantor on more than $10 million in loans at the Bank, a violation of Bank policy.  At minimum, Defendants Cameron, Davis and McGaha knew that Guarantor B's guarantees of Bank loans were in violation of Bank policy, as they approved both the UIMC LOC and the

loan to Hi-Roc.  Guarantor B's listed $200,000 annual income and credit score also did not indicate Guarantor B had the financial strength to service or pay off UIMC's $5 million LOC.  Finally, no cash flow or debt service coverage analysis of Guarantor B was performed and that section on the credit memorandum was left blank.

99.     On or around June 13, 2006, Defendants Cameron, Davis, Dixon, McGaha and Reese approved a $276,446 increase in the UIMC LOC, to $5,276,446.  Only two months after the UIMC LOC's initial approval, this increase raised the LOC to the Bank's legal lending limit.  The credit memorandum presented to the Defendants who approved this increase provided virtually identical financial and other information related to UIMC and Guarantor B as was contained in the credit memorandum for the original UIMC LOC.  Thus, this second credit memorandum revealed the same deficiencies and violations of the Bank's Loan Policy and prudent banking practices, discussed in paragraphs 93-98 above, that showed the UIMC LOC increase should not have been approved.

100.   Between January 2007 and August 2008, at least 19 loans to UIMC customers were funded using the UIMC LOC.

101.   For the reasons discussed above, including in paragraphs 93-100, Defendants Cameron, Davis, Dixon, McGaha and Reese were negligent and

grossly negligent in connection with the UIMC LOC and have caused damages related thereto estimated at approximately $2.7 million.

### 4. Vision 278, L.L.C. Loan

102.   On or around October 11, 2005, Defendants Dixon, Dumas, Mask, McGaha and Reese approved a $4.5 million loan to Vision 278, L.L.C. ("Vision") for the purpose of refinancing Vision's existing ADC debt at Integrity Bank of Alpharetta, Georgia ("Integrity").  The primary source of repayment of the loan was the sale of commercial lots and the secondary source of repayment was the liquidation of collateral.  The loan was secured by a first deed to secure debt on 12 acres of real estate located in Cobb County, Georgia, and by the personal guarantee of Vision's principal, Guarantor C.

103.   The credit memorandum presented to the Defendants who approved this loan, along with the other information provided to them by the loan officer during the DLC meeting, revealed multiple deficiencies and violations of the Bank's Loan Policy and prudent banking practices which showed this refinance loan should not have been approved.

104.   Vision was a recently formed entity with no listed business history, financial statements or tax returns.  Vision's principal, Guarantor C, also was a new customer of the Bank.  "Key risks" listed in the credit memorandum for this

refinance request were "[c]hanges or downturn in construction industry" and

"[f]ailure of management to successfully market the commercial parcels."  The

credit memorandum indicated that Guarantor C was overextended and under

financial stress.  While Guarantor C was represented to have total assets of $26

million, only $347,000 of that amount was cash and $30,000 was "retirement"

funds.  $23 million of Guarantor C's "assets" consisted of unidentified notes

receivable, "other" real estate investments, and self-reported values of interests in

unspecified closely held businesses.  The credit memorandum noted that Guarantor

C had $4.6 million in total liabilities, as well as $19 million in additional

contingent liabilities.  The credit memorandum provided limited financial

information related to another Guarantor C company, but that information was

company-prepared, included stale data up to two years old, and did not indicate

that Guarantor C had the financial strength to service or pay off Vision's $4.5

million refinance loan.

 105.  As reflected in the October 11, 2005 DLC meeting minutes, the loan

officer who presented this refinance loan told Defendants Dixon, Dumas, Mask,

McGaha and Reese that Guarantor C needed this loan in order to "diversify" his

banking relationships.  The financial and other information listed in the credit

memorandum made clear that Guarantor C was not simply looking to establish a

new relationship with the Bank, but rather was in need of funds to keep another bank (Integrity) from calling his debts.  The credit memorandum was silent as to the current status of Vision's existing debt at Integrity.  Pursuant to the Loan Policy and prudent banking practices, the Defendants who approved this refinance had a duty to analyze the current status of that debt in order to determine whether the requested refinance was prudent, but they failed to do so.  Had those Defendants requested and received that basic underwriting information, they would have learned that Vision was in default on that loan, and that a $75,000 forbearance fee to Integrity and $852,000 in payments to concrete and construction contractors were outstanding and required to be paid off in order to close the refinance loan.

106.   For the reasons discussed above, including in paragraphs 102-105, Defendants Dixon, Dumas, Mask, McGaha and Reese were negligent and grossly negligent in connection with the loan to Vision and have caused damages related thereto estimated at more than $2.6 million.

### 5.   LLC A Loans

107.   On or around September 18, 2006, Defendants Dixon, Dumas, Mask and McGaha approved funding of $4.75 million to LLC A to purchase and develop 59.1 acres of property.  This approval resulted in two loans to LLC A: (i) a

$3,108,840 loan to purchase and develop 28.45 acres for phase one of the development; and (ii) a $1,491,208 loan to purchase the remaining 30.65 acres for phase two of the development.  The primary source of repayment for the loans was to be the sale of developed lots, and the secondary source of repayment was "personal assets/liquidity and outside income" of LLC A's principal, Guarantor D. This funding was secured by a first deed to secure debt on the property, a $330,000 certificate of deposit pledged as collateral in lieu of a down payment, and the personal guarantee of Guarantor D.

108.   The credit memorandum presented to the Defendants who approved these loans, along with the attached "financial review" memorandum prepared by the loan officer and other information provided to them by the loan officer during the DLC meeting, revealed deficiencies and violations of the Bank's Loan Policy and prudent banking practices that showed these loans should not have been approved.

109.   With respect to the primary source of repayment, sale of developed lots, the credit memorandum and attached financial review memorandum did not provide sufficient information regarding the quality or liquidity of the collateral. Neither memorandum provided any information or analysis regarding the proposed budget to develop the lots, how the developed lots would be marketed, how the

sales prices of the developed lots would be set, or other factors affecting the

feasibility of the project.  No appraised values were listed, and the Defendants who

approved this credit memorandum did not require as a condition for approval that

the collateral be appraised prior to closing to confirm that the loans would comply

with the Loan Policy's LTV ratio limits.

110.   With respect to the secondary source of repayment, the personal assets

and income of Guarantor D, LLC A and Guarantor D were new customers of the

Bank.  The credit memorandum did not list any financial information related to

LLC A, but the attached financial review memorandum indicated LLC A had $8

million in liabilities on other unspecified projects.  While Guarantor D was

represented to have a net worth of $3.3 million, $2.5 million of his listed assets

consisted of notes receivable and self-valued real estate and automobiles.  The

credit memorandum stated Guarantor D had no contingent liabilities.  However,

the attached financial review memorandum indicated Guarantor D had personally

guaranteed $11.6 million in debts at other financial institutions.  The financial

review memorandum also noted that Guarantor D would not personally oversee the

development of this project.  Instead, Guarantor D would retain a separate

company (Development Site Services, Inc. ("DSS")) to "control all aspects of the

project from due diligence to completion" in coordination with Guarantor D's

brother.  Neither the credit memorandum nor the financial review memorandum indicated that DDS or Guarantor D's brother had any prior experience managing or completing similar projects.

111.   A "key risk" listed in the credit memorandum was "market downturn."  The Defendants who approved these loans were aware that LLC A did not have a builder confirmed to purchase the lots in the development as a result of cost and market uncertainties.  As reflected in the financial review memorandum and in the DLC meeting minutes, the loan officer told these Defendants that LLC A "is reluctant to secure a [sales] contract due to the continued increase in costs and the uncertainties in establishing values prior to completion of the project." The DLC meeting minutes also showed that these Defendants recognized the high-risk nature of the loans by initially requesting that the proposed funding be subject to a $3 million participation with another financial institution, only to approve the loans without any such participation.

112.   On or around October 16, 2007, Defendants Dixon, Dumas, Leslie, McGaha and Reese approved a $300,000 increase to LLC A's loan related to phase one of the development.  This increase was purported to be for the purpose of funding cost overruns associated with erosion control, surveys and sewer connections for the project.  The credit memorandum presented to the Defendants

45

who approved this increase, as well as other information provided to them by the

loan officer, revealed similar deficiencies and violations of the Bank's Loan Policy

and prudent banking practices that indicated this increase should not have been

approved.

113.    The "key risk" listed in the credit memorandum for the increase was

"market conditions."  The DLC meeting minutes showed that the Defendants who

approved this increase recognized the high-risk nature of lending additional money

to LLC A because they initially requested that the increase be subject to a takeout

of the $1,491,208 phase two loan and the release of draws to LLC A on a specific

schedule for the remainder of phase one costs.  Despite those concerns, they

approved the increase without requiring a takeout of LLC A's phase two loan or

implementing a specific draw schedule for remaining phase one costs.  The loan

officer also told the Defendants who approved this increase that "[LLC A] has

attempted to refinance Phase II with several other banks [but] has been

unsuccessful."  The credit memorandum and DLC meeting minutes indicated that

LLC A was overextended at that time, with four separate development projects

under way and nearly $13 million in liabilities on those projects.  While the credit

memorandum for the increase stated Guarantor D had no contingent liabilities, at

minimum, Defendants Dixon, Dumas and McGaha were aware that Guarantor D

had personally guaranteed LLC A's other substantial debts based on the information presented to them when they approved the original loans to LLC A.

114.   For the reasons discussed above, including in paragraphs 107-113, Defendants Cameron, Davis, Dixon, Dumas, Leslie, Mask, McGaha, Reese and Strain were negligent and grossly negligent in connection with the LLC A loans and have caused damages related thereto estimated at approximately $1.9 million combined.

## V.  CAUSES OF ACTION

### Count One - Ordinary Negligence Under Georgia Law
### (All Defendants)

115.   The FDIC-R incorporates by reference herein each of the allegations set forth above.

116.   As officers and/or directors of the Bank, at all times, Defendants owed the Bank and its depositors, account holders, other creditors, and stockholders a duty of care under O.C.G.A. §§ 7-1-490, 51-1-2, and other provisions of Georgia law, to exercise the diligence, care, and skill that ordinarily prudent persons would exercise under similar circumstances in like position.  Georgia law defines "ordinary negligence" as the absence of such diligence.

117.   Defendants' actions and inactions as described herein exhibit the absence of such diligence as to constitute ordinary negligence under Georgia law.

118.   Defendants are not entitled to the application of the business judgment rule because Defendants were not reasonably well-informed in taking such actions or inactions as each Defendant repeatedly approved loans in violation of the Loan Policy, regulations and prudent banking practices.

119.   With respect to their negligent actions and inactions, Defendants pursued a common plan or design, or otherwise acted in a common or concerted manner, and therefore, each Defendant is jointly and severally liable for all damages on the Subject Loans he approved.

120.   As a direct and proximate result of Defendants' ordinary negligence, the FDIC-R suffered damages in an amount to be determined at trial.

## Count Two - Gross Negligence Under Georgia Law and 12 U.S.C. § 1821(k)
### (All Defendants)

121.   The FDIC-R incorporates by reference herein each of the allegations set forth in paragraphs 1 through 114 above.

122.   Section 1821(k) of The Financial Institutions Reform, Recovery and Enforcement Act, 12 U.S.C. § 1821(k), provides that directors and officers of failed financial institutions may be held liable to FDIC receiverships for loss or damage caused by their "gross negligence," as defined by applicable state law. Georgia law defines "gross negligence" as the absence of that degree of care which every man of common sense, however, inattentive he may be, exercised under the

same or similar circumstances. O.C.G.A. § 51-1-4.

123.   As officers and/or directors of the Bank, at all times, Defendants owed

the Bank and its depositors, account holders, other creditors, and stockholders a

duty to use care, skill, and diligence in the performance of their duties as officers

and/or directors of the Bank.

124.   Defendants' actions and inactions as described herein exhibit such a

degree of carelessness and/or inattention as to constitute gross negligence under

Georgia law.

125.   With respect to their grossly negligent actions and inactions,

Defendants pursued a common plan or design, or otherwise acted in a common or

concerted manner, and, therefore, each Defendant is jointly and severally liable for

all damages on the Subject Loans he approved.

126.   As a direct and proximate result of Defendants' gross negligence, the

FDIC-R suffered damages in an amount to be determined at trial.

## VI.  JURY DEMAND

127.   Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the

FDIC-R respectfully demands a trial by jury for all issues in this case that are

triable by jury.

## VII.  PRAYER FOR RELIEF

128.   The FDIC-R prays for a money judgment against all Defendants,

jointly and severally, in sums to be proven at trial, together with appropriate

interest pursuant to 12 U.S.C. § 1821(l), the costs of this action, and such other and

further relief as the Court deems just and proper.

Respectfully submitted, this  18th day of June, 2013.

**SHINGLER LEWIS LLC**

/s/ Joyce Gist Lewis
Joyce Gist Lewis
Georgia Bar No. 296261
George P. Shingler
Georgia Bar No. 642850
Ashley E. Wilson
Georgia Bar No. 771512
**Attorneys for Plaintiff Federal Deposit
Insurance Corporation as Receiver for
Southern Community Bank**

1230 Peachtree Street, Suite 1075
Atlanta, Georgia 30309
Phone: (404) 907-1999
jlewis@shinglerlewis.com
gshingler@shinglerlewis.com
awilson@shinglerlewis.com

*-and-*

50

**KEEGAN, DENICOLA, KIESEL,
BAGWELL, JUBAN & LOWE, LLC**

Kyle M. Keegan (*Pro Hac Vice* pending)
Louisiana Bar No. 19942
Susannah DeNicola (*Pro Hac Vice* pending)
Louisiana Bar No. 21558
Chris D. Kiesel (*Pro Hac Vice* pending)
Louisiana Bar No. 26360
**Attorneys for Plaintiff Federal Deposit
Insurance Corporation as Receiver for
Southern Community Bank**

5555 Hilton Ave., Suite 205
Baton Rouge, Louisiana 70808
Phone: (225) 364-3600
kmk@keegandenicola.com
smd@keegandenicola.com
cdk@keegandenicola.com

**EXHIBIT A**

| Subject Loans | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Approval Votes | | | | | | | | | |
| Borrower | Original Amount ($ million) | Approval Date | Cameron | Davis | Dixon | Dumas | Leslie | Mask | McGaha | Reese | Strain |
| Reese 1 | $0.500 | 7/23/2004 | | | x | x | x | | x | | x |
| Reese 2 | $0.400 | 1/4/2005 | x | x | x | | | x | x | | x |
| Reese 2a | $0.300 | 3/22/2005 | x | x | x | x | | | x | | x |
| Reese 3 | $0.250 | 4/19/2005 | x | x | x | x | | | x | | x |
| Reese 3a | $0.301 | 11/15/2005 | | | x | x | x | | x | | |
| Reese 4 | $0.200 | 6/29/2006 | | x | x | x | | x | x | | |
| Reese 5 | $0.350 | 5/25/2007 | | x | x | x | | | x | | x |
| Borrower A 1 | $2.500 | 4/7/2005 | x | | | x | | | x | | |
| Borrower A 1a | $1.500 | 5/30/2006 | x | x | x | | | | x | x | x |
| Borrower A 1b | $1.776 | 8/8/2006 | | | x | x | x | x | x | x | |
| Borrower A 2 | $0.485 | 1/22/2008 | x | x | x | x | | | x | x | x |
| UIMC 1 | $5.000 | 4/4/2006 | x | x | | | | | x | x | |
| UIMC 1a | $0.276 | 6/13/2006 | x | x | x | | | | x | x | |
| Vision | $4.500 | 10/11/2005 | | | x | x | | x | x | x | |
| LLC A 1 | $1.491 | 9/18/2006 | | | x | x | | x | x | | |
| LLC A 2 | $3.108 | 9/18/2006 | | | x | x | | x | x | | |
| LLC A 2a | $0.300 | 10/16/2007 | | | x | x | x | | x | x | |
| **TOTAL** | **$23.237** | | | | | | | | | | |